UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Civil Action No.:

CONSEAL INTERNATIONAL
INCORPORATED, a Florida corporation,

   Plaintiff,

v.

NEOGEN CORPORATION, a Michigan
corporation,

   Defendant.
_____/

# COMPLAINT

Plaintiff, CONSEAL INTERNATIONAL INCORPORATED ("Plaintiff" or "ConSeal"), by and through undersigned counsel, sues Defendant, NEOGEN CORPORATION ("Defendant" or "Neogen"), and alleges as follows:

## THE PARTIES

1. Plaintiff, ConSeal, is a Florida corporation doing business within this District.

2. Defendant, Neogen, is a Michigan corporation with, upon information and belief, its principal place of business in Lansing, Michigan doing business throughout the United States, including within this District.

## JURISDICTION AND VENUE

3. This is an action for, among other things, breach of contract and for other common law claims and causes of action.

1

4. This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

5. This Court has personal jurisdiction over Neogen because the subject agreement provides for jurisdiction in Florida for any lawsuit arising out of or related to the subject agreement. This action arises out of and relates to the subject agreement. Additionally, upon information and belief, Neogen acquired all of the stock and assets of Preserve, Inc. ("Preserve"), is the successor-in-interest to Preserve, assumed all of the obligations of Preserve in the subject agreement, and is bound by the subject agreement.

6. Additionally, upon information and belief, Neogen is marketing, offering for sale, or selling goods in Florida, or previously marketed, offered for sale, or sold goods in Florida, which relate to the claims asserted by ConSeal. Moreover, upon information and belief, Neogen has conducted, engaged in and/or carried on business within the State of Florida, breached a contract in this state, assumed a contract with a Florida choice of law provision that was entered into in Broward County, Florida, and/or caused injury within the State of Florida. By virtue of its actions described herein, this Court's exercise of personal jurisdiction over Neogen is consistent with the Constitution of the United States and Fla. Stat. § 48.193.

7. Venue is proper in the United States District Court for the Southern District of Florida pursuant to at least 28 U.S.C. §§ 1391, and because the subject agreement provides for venue in this District for any lawsuit arising out of or related to the subject agreement. This action arises out of and relates to the subject agreement.

**GENERAL ALLEGATIONS**

8. ConSeal is a manufacturer of various solid and liquid products, including disinfectant and sanitizer chemical products, processes and methods. ConSeal has developed and owns the formulations, processes and technology for its products.

9. ConSeal does not advertise or market its products or sell its products directly to consumers but rather contracts with third parties to market, promote, sell and distribute its products. ConSeal manufactures specific products for a third party and then packages and labels the products for shipment and delivery with the third party's chosen trade name for the product.

10. Among other things, ConSeal has developed and formulated a line of chlorine dioxide products that act as liquid sanitizers. ConSeal holds an EPA registration for its line of chlorine dioxide products under the federally registered trademark SANICIDE.

11. Preserve, who is a predecessor-in-interest to Neogen, was a seller and distributor of cleaners, disinfectants and associated products in the livestock and food processing industries. In or about 2009, Preserve approached ConSeal about selling one of ConSeal's SANICIDE liquid sanitizer products, which ConSeal referred to as SANICIDE-5. Specifically, SANICIDE-5 is a liquid formula containing a stabilized chlorine dioxide solution for use in livestock facilities to improve drinking water by sanitizing and disinfecting.

12. ConSeal and Preserve negotiated an informal arrangement for ConSeal to manufacture and deliver SANICIDE-5 to Preserve for marketing, advertising, distribution and sale as an EPA sub-registered product under the tradename "MaxKlor" ("MaxKlor products" or "Licensed Products").

13. Preserve commenced purchasing the MaxKlor products from ConSeal for marketing, sale and distribution in November 2009. At that time, the parties had not entered into

a formal written agreement. Preserve did not have exclusivity to SANICIDE-5/MaxKlor products at that time and ConSeal was permitted to sell SANICIDE-5 or similar formulations to other third party marketers and distributors. On the other hand, Preserve was not required to purchase a specific amount of MaxKlor products from ConSeal at that time. Rather, Preserve would request a certain quantity of products from ConSeal through a purchase order and ConSeal would fulfill the orders by manufacturing and delivering that requested quantity.

14. In or about early 2015, Preserve desired to enter into a more formal agreement regarding SANICIDE-5/MaxKlor products. Specifically, Preserve desired to be the exclusive seller of SANICIDE-5/MaxKlor products in the U.S., Canada and Mexico within certain Market Segments. ConSeal agreed on the condition that Preserve would purchase a minimum amount of the SANICIDE-5/MaxKlor products annually, as such exclusivity would preclude ConSeal from selling its SANICIDE-5 product to other parties within the Market Segments.

15. On or about May 20, 2015, ConSeal and Preserve entered in a formal, written "License Agreement" ("License Agreement" or "Agreement") that governed the manufacture of the MaxKlor products by ConSeal and the exclusive license for Preserve to market, advertise, distribute and sell the MaxKlor products. A true and correct copy of the License Agreement is attached hereto as **Exhibit "A."**

16. The original term of the License Agreement was from the Effective Date through December 31, 2019. *License Agreement*, § 10. The License Agreement is governed by Florida law. *License Agreement*, § 13(h).

17. The License Agreement provided Preserve with the exclusive right and license to advertise, market, distribute and sell the MaxKlor products in the U.S., Canada and Mexico within "Market Segments," as that term is defined in the License Agreement. *License Agreement*, §§ 2(a)

4

and 2(b). Moreover, ConSeal agreed "not to produce any identical or substantially similar formula or formulas as for the Licensed Products listed in Schedule "A" for sale or distribution to any third party in any Market Segment identified in Schedule "C" during the Term of this Agreement," subject to limited exceptions set forth in that Section. *License Agreement*, § 8(b).

18. In exchange for exclusivity, Preserve agreed as follows: "To maintain its exclusive right under this Agreement, [Preserve] agrees to make minimum purchases of the Licensed Products identified in Schedule "A" pursuant to the performance schedule set forth in Schedule "D" of this Agreement." *License Agreement*, § 9.

19. Preserve also agreed that the minimum purchase requirements were "monetary obligations" under the License Agreement and that "[t]he minimum purchases made hereunder shall constitute the consideration received by ConSeal from [Preserve] in exchange for the license granted hereunder." *License Agreement*, § 9.

20. After execution of the License Agreement, Preserve began purchasing MaxKlor products from ConSeal in accordance with the terms of the Agreement.

21. In or about the spring of 2016, upon information and belief, Neogen, who markets and sells products in the food and animal safety industry, acquired all of the stock and assets of Preserve, including the License Agreement. Press releases regarding the acquisition were issued on or about May 2, 2016.

22. As part of the acquisition, Neogen assumed the Licensed Agreement. Immediately after the acquisition, in May 2016, Neogen began purchasing the MaxKlor products from ConSeal and marketing, distributing and selling those products in accordance with the terms of the License Agreement. Neogen representatives also traveled to meet ConSeal representatives in person to discuss their continued relationship under the License Agreement. The parties have operated

continuously and without objection since May 2016 with Neogen as the Licensee under the Agreement. Moreover, the License Agreement provides that "[t]his Agreement shall be binding upon, and shall inure to the benefit of, the parties and their respective Affiliates, <u>successors</u>, permitted assigns . . . ." *License Agreement*, § 13(l) (emphasis added).

23. In July 2018, Neogen reached out to ConSeal via email and sought for the party representatives to meet in person. After communicating over several days, ConSeal learned that the reason for the requested in-person meeting was that Neogen had decided to source a new sodium chlorite product called "NeoKlor" from a different manufacturer and was electing to discontinue purchase of the MaxKlor products from ConSeal. Indeed, upon information and belief and according to representations made by Neogen, Neogen commenced selling the competing NeoKlor products in or about August 2018.

24. The reason provided for by Neogen for switching to the new NeoKlor products was for better pricing. For example, in an email from Neogen dated August 21, 2018, Neogen stated that "we needed to source a more economical alternative."

25. Neogen represented to ConSeal that it sought pricing concessions from ConSeal in order to continue selling the MaxKlor products. However, ConSeal was under no obligation to offer pricing concessions. Additionally, Preserve represented and warranted in the License Agreement that "Licensee has thoroughly investigated the Licensed Products and is convinced of their functional value and the economic and marketing possibilities." *License Agreement*, § 4(d). Indeed, Preserve had been purchasing the MaxKlor products from ConSeal for over five years when the parties entered into the License Agreement and Preserve made such representation based on years of experience with the MaxKlor products.

26. Additionally, ConSeal had continuously absorbed raw material cost and packaging cost increases for years without ever increasing the costs of MaxKlor products to Neogen and Preserve. ConSeal continuously maintained the same price of MaxKlor products to Neogen and Preserve. Moreover, despite Neogen's representations and even though ConSeal had no obligation to do so, ConSeal had previously engaged in communications with Neogen regarding potential price adjustments, but ConSeal's necessary questions to consider price adjustments all went unanswered by Neogen.

27. On or about August 31, 2018, ConSeal initially reminded Neogen of the minimum purchase requirements in the License Agreements in writing and that Neogen was well short of the requirements for 2018. ConSeal provided additional written notices regarding the failure to meet minimum purchase requirements over the next several months.

28. Neogen has not purchased any MaxKlor products from ConSeal since July 2018. Neogen failed to meet its minimum purchase requirements for 2018 and will presumably fail to meet the minimum purchase requirements for 2019 because it is not purchasing any MaxKlor products from ConSeal at this time.

29. On or about November 8, 2018, Neogen sent ConSeal a letter purporting to terminate the License Agreement ("Termination Letter") under Section 11 of the License Agreement. A true and correct copy of the Termination Letter is attached hereto as **Exhibit "B."** The reason provided in the Termination Letter by Neogen for purportedly terminating the License Agreement was that ConSeal would not adjust its pricing for the MaxKlor products.

30. However, Neogen did not have a right to terminate the License Agreement. Section 11 of the License Agreement provides that the parties may terminate the License Agreement in the event of a non-performance breach after thirty days' written notice and an opportunity to cure.

*License Agreement*, § 11(a).  However, ConSeal did not breach the License Agreement, and Neogen did not even claim that ConSeal breached the License Agreement or provide the written notice required by Section 11.  Thus, the purported termination was ineffective.

       31.     On the other hand, the License Agreement provides that breaches of the minimum purchase requirements are considered "performance defaults," and that "ConSeal, in its sole discretion, shall have the right to file an action seeking damages in the full amount of Licensee's monetary obligations under this Agreement." *License Agreement*, § 11(b). ConSeal is electing to seek damages for Neogen's breach of the License Agreement for failing to comply with the minimum purchase requirements, which are monetary obligations under the Agreement, in 2018 and 2019.

       32.     Neogen failed to meet the minimum purchase requirements set forth in the License Agreement in 2018 by 52,185 gallons of MaxKlor products.  The total amount of monetary obligations owed by Neogen to ConSeal for failing to comply with the minimum purchase requirements in 2018 is $535,418.10.  That calculation is based on the discounted price of $10.26 per gallon charged to Neogen when Neogen purchased the MaxKlor products in drums.  Neogen purchased MaxKlor products from ConSeal in either drums or pails, and the price per gallon when purchased in pails was more expensive.

       33.     Based on Neogen's communications and actions, it is apparent that Neogen does not intend to purchase any MaxKlor products from ConSeal in 2019 through the expiration of the initial term of the License Agreement on December 31, 2019.  Assuming that Neogen does not purchase any MaxKlor products from ConSeal in 2019, Neogen will have failed to meet the minimum purchase requirements set forth in the License Agreement in 2019 by 115,474 gallons.  In such a case, the total amount of monetary obligations owed by Neogen to ConSeal for failing

to comply with the minimum purchase requirements in 2019 will be $1,184,763.24. That calculation is again based on the discounted price of $10.26 per gallon when purchased in drums.

34. Thus, the total amount owed by Neogen for minimum purchase requirements through the end of the initial term of the License Agreement is $1,720,181.34.

35. Moreover, ConSeal suffered additional damages due to Neogen's breach of the License Agreement, such as costs to cancel shipments of unnecessary materials due to Neogen's failure to purchase.

36. All conditions precedent to the filing of this action have been fulfilled or waived.

37. ConSeal has retained the undersigned counsel to represent it in this action and is obligated to pay undersigned counsel's reasonable attorneys' fees, which fees, together with costs, ConSeal is entitled to recover from Neogen pursuant to at least Section 13(i) of the License Agreement.

## COUNT I – BREACH OF CONTRACT

38. ConSeal re-alleges and re-avers paragraphs 1-37 as though fully set forth herein.

39. On or about May 20, 2015, ConSeal and Preserve entered into the valid and enforceable License Agreement. Neogen assumed the License Agreement in or about the spring of 2016 when it acquired all of the stock and assets of Neogen, including the License Agreement.

40. Neogen breached the License Agreement by, among other things, failing to pay ConSeal the minimum purchase requirements owed under the License Agreement. Moreover, Neogen attempted to improperly terminate the License Agreement.

41. As a direct and proximate result of Neogen's breaches of the License Agreement, ConSeal has been damaged and is entitled to recover from Neogen all damages, including

monetary obligations owed under the License Agreement, compensatory damages and/or other damages, resulting from Neogen's breaches of the License Agreement.

42. Additionally, ConSeal is entitled to recover from Neogen all costs and attorneys' fees incurred by ConSeal in connection with this lawsuit, including pre-trial, trial and all appellate level fees and costs, pursuant to Section 13(i) of the License Agreement.

## COUNT II – OPEN ACCOUNT

43. ConSeal re-alleges and re-avers paragraphs 1-37 as though fully set forth herein.

44. This is a cause of action for open account being pled in the alternative to ConSeal's breach of contract claim (Count I).

45. From May 2014, ConSeal provided Preserve, and then Neogen when Neogen acquired the stock and assets of Preserve, with an exclusive license to market, advertise, sell and distribute MaxKlor products in the U.S., Canada and Mexico within the Market Segments. Neogen agreed to pay monetary obligations to ConSeal in exchange for the exclusive license.

46. Neogen has failed to pay its monetary obligations owed to ConSeal in the amount of $1,720,181.34 and, as a result, ConSeal has been damaged. ConSeal is entitled to recover from Neogen the amount of $1,720,181.34 in monetary obligations owed to ConSeal, plus prejudgment and post-judgment interest.

## COUNT III – ACCOUNT STATED

47. ConSeal re-alleges and re-avers paragraphs 1-37 as though fully set forth herein.

48. This is a cause of action for account stated being pled in the alternative to ConSeal's breach of contract claim (Count I).

49. Prior to this lawsuit, ConSeal and Neogen had business transactions between them. ConSeal manufactured MaxKlor products for Neogen and provided Neogen an exclusive license

to market, advertise, sell and distribute the MaxKlor products in the U.S., Canada and Mexico within the Market Segments. In exchange for the exclusive license, Neogen agreed to make minimum purchase requirements from ConSeal. A debtor-creditor relationship exists between Neogen and ConSeal in that Neogen owes ConSeal monetary obligations for minimum purchase requirements.

50. At least one invoice was presented to Neogen by ConSeal on or about January 9, 2019 showing the amount due by Neogen to ConSeal for the minimum purchase requirements in 2018 in the amount of $535,520.70. A true and correct copy of the invoice is attached hereto as **Exhibit "C."** The invoice shows the minimum purchase requirement in gallons converted to drums, as Neogen always purchased MaxKlor products from ConSeal in either drums or pails. Drums were the least expensive option per gallon and, thus, ConSeal used drums for calculating the amount owed in the January 9, 2019 invoice.

51. Neogen accepted the amount due by, among other things, not objecting to the requested payment amount within a reasonable time period after receipt.

52. Neogen promised, expressly or impliedly, to pay the amount owed for the minimum purchase requirements for 2018 reflected in the invoice.

53. However, Neogen has failed to pay the full amount due and, as a result, ConSeal has been damaged.

54. As a result, ConSeal is entitled to recover from Neogen all damages, including compensatory damages and/or other damages, resulting from Neogen's failure to pay the full amount due in 2018 as reflected in the invoice.

## COUNT IV – PROMISSORY ESTOPPEL

55. ConSeal re-alleges and re-avers paragraphs 1-37 as though fully set forth herein.

56. This is a cause of action for promissory estoppel being pled in the alternative to ConSeal's breach of contract claim (Count I) in the event that a valid and enforceable contract is not found to exist between ConSeal and Neogen.

57. Neogen made a clear and unambiguous promise to make minimum purchase requirements from ConSeal in exchange for the exclusive right to market, advertise, sell and distribute MaxKlor products in the U.S., Canada and Mexico within the Market Segments.

58. ConSeal acted in reliance on Neogen's promise by refraining from selling the MaxKlor products/SANICIDE-5 to any third parties.

59. ConSeal's reliance on Neogen's promise was both reasonable and foreseeable.

60. ConSeal has been damaged due to its reliance on Neogen's promise and Neogen's failure to comply with that promise. As a result, ConSeal is entitled to recover from Neogen all damages, including compensatory damages and/or other damages, resulting from Neogen's failure to comply with its promise.

## COUNT V – UNJUST ENRICHMENT

61. ConSeal re-alleges and re-avers paragraphs 1-37 as though fully set forth herein.

62. This is a cause of action for unjust enrichment being pled in the alternative to ConSeal's breach of contract claim (Count I) in the event that a valid and enforceable contract is not found to exist between ConSeal and Neogen.

63. ConSeal conferred a benefit upon Neogen. Specifically, ConSeal provided Neogen an exclusive license to market, advertise, sell and distribute MaxKlor products in the U.S., Canada and Mexico within the Market Segments.

64. Neogen retained such benefit at ConSeal's expense. However, Neogen failed to fully compensate ConSeal the full value of such benefit and, as a result, ConSeal has been damaged.

65. Equity and good conscience require that ConSeal be compensated for such benefit conferred upon Neogen.

66. As a result, ConSeal is entitled to recover from Neogen all damages, including compensatory damages and/or other damages, resulting from Neogen's failure to fully compensate ConSeal for the benefit that ConSeal conferred upon Neogen.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, CONSEAL INTERNATIONAL INCORPORATED, prays for judgment against Defendant, NEOGEN CORPORATION, as follows:

A. Finding Defendant liable for breach of the License Agreement;

B. Ordering Defendant to pay ConSeal monetary relief for all damages incurred by ConSeal as a result of Defendant's breach of the License Agreement, including the amount of monetary obligations owed to ConSeal by Defendant under the License Agreement;

C. Finding Defendant liable for the other claims and actions set forth in the Complaint and ordering Defendant to pay ConSeal monetary relief for all damages incurred as a result of Defendant's actions as set forth in those claims;

D. Awarding ConSeal its reasonable attorneys' fees incurred in connection with this action, including all fees incurred pre-suit;

E. Finding that ConSeal is entitled to recover its costs of Court;

F. Finding that ConSeal is entitled to prejudgment and post-judgment interest; and

G. For such other and further relief the Court deems just and proper.

Dated: May 16, 2019                                     Respectfully submitted,

By: /s/Joshua D. Martin
Joshua D. Martin
Florida Bar No. 028100
josh.martin@johnsonmartinlaw.com
JOHNSON & MARTIN, P.A.
500 W. Cypress Creek Rd., Suite 430
Fort Lauderdale, Florida  33309
Telephone:  (954) 790-6699
Facsimile:  (954) 206-0017

*Attorney for Plaintiff, ConSeal International Incorporation*