UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-61242-BLOOM/Valle

CONSEAL INTERNATIONAL
INCORPORATED,

      Plaintiff,

v.

NEOGEN CORPORATION,

      Defendant.

_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Plaintiff ConSeal International Inc.'s ("Plaintiff")

Motion for Summary Judgment on its Breach of Contract Claim (Count I), ECF Nos. [71] & [77]

("Plaintiff's Motion"), and Defendant Neogen Corporation's ("Defendant") Motion for Summary

Judgment, ECF Nos. [69] & [81][1] ("Defendant's Motion"), (collectively, the "Motions"). The

Court has carefully reviewed the Motions, all opposing and supporting submissions, the record in

this case, and the applicable law, and is otherwise fully advised. For the reasons set forth below,

Plaintiff's Motion is denied and Defendant's Motion is denied.

## I. BACKGROUND

Plaintiff initiated its breach of contract action against Defendant on May 16, 2019. ECF

No. [1] ("Complaint"). The Complaint asserts five Counts: Count I – Breach of Contract; Count

---

[1] Plaintiff initially filed a redacted Motion, ECF No. [71], which it later refiled under seal without redactions, ECF No. [77]. Likewise, Defendant initially filed a redacted version of its Motion, ECF No. [69], and an unredacted version of which was later filed under seal, ECF No. [81]. All of the subsequent briefs and exhibits for each of the Motions were similarly filed both as publicly available redacted versions and as sealed, unredacted versions. Throughout the remainder of this Omnibus Order, the Court will reference and cite to the sealed and unredacted versions of these briefs and exhibits.

II – Open Account; Count III – Account Stated; Count IV – Promissory Estoppel; and Count V – Unjust Enrichment. *See generally id.* On July 9, 2019, Defendant filed its Answer and Affirmative Defenses to Plaintiff's Complaint, ECF No. [11] ("Answer"), which asserted seven affirmative defenses: (1) the License Agreement, ECF No. [80-2] ("Agreement" or "License Agreement"), is not enforceable against Defendant because it is not a party to the Agreement nor was it ever properly assigned to Defendant; (2) Preserve, Inc. ("Preserve") is the Licensee and counter-party to the License Agreement, not Defendant; (3) the License Agreement is illusory and unenforceable because it fails to fix a price term and therefore lacks a meeting of the minds; (4) Plaintiff's claims are barred due to its failure to set commercially reasonable price terms in good faith; (5) Plaintiff's claims are barred because it failed to mitigate its damages; (6) Plaintiff cannot recover any amount beyond its provable economic damages; and (7) recovery for the minimum purchase requirements under the License Agreement would amount to an unenforceable penalty against Defendant to pay liquidated damages. ECF No. [11].

Plaintiff has filed its Motion, ECF No. [77], along with its corresponding Statement of Material Facts, ECF No. [78] ("Plaintiff's SMF"). Defendant filed its Response in Opposition, ECF No. [97] ("Defendant's MSJ Response"), and its Response to Plaintiff's SMF, ECF No. [96] ("Defendant's SMF Response"). Plaintiff also filed a Reply, ECF No. [112] ("Plaintiff's MSJ Reply").

Defendant has filed its Motion, ECF No. [81], with its corresponding Statement of Material Facts in Support of its Motion, ECF No. [80] ("Defendant's SMF"). Plaintiff filed a response in opposition, ECF No. [99] ("Plaintiff's MSJ Response"), together with its Statement of Material Facts in Opposition, ECF No. [100] ("Plaintiff's SMF Response"). Finally, Defendant filed a Reply in Support of its Motion, ECF No. [111] ("Defendant's MSJ Reply"), and a Reply in Support

of its Statement of Material Facts, ECF No. [103] ("Defendant's SMF Reply"). The Motions, accordingly, are ripe for consideration.

## II.  MATERIAL FACTS

Based on the parties' statements of material facts in support of and in opposition to the Motions, along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

Plaintiff is a specialty chemical private label manufacturer of multiple different products. ECF No. [78-1] ¶ 3. Around 2009, Preserve approached Plaintiff about selling one of Plaintiff's liquid chemical formulas containing a stabilized chlorine dioxide solution for use in livestock facilities for sanitizing and disinfecting. *Id.* ¶ 4; ECF No. [78-2] at 36:3-37:11. Through this arrangement, but without any formal written agreement, Plaintiff began selling the product to Preserve in 2009 for the marketing, distribution, and sale by Preserve as an EPA sub-registered product under the tradename "MaxKlor" ("MaxKlor" or "MaxKlor products"). ECF No. [78-1] ¶ 5; ECF No. [78-2] at 37:21-24, 42:16-43:2.

After several years, in late 2015, Plaintiff and Preserve entered into a formal written License Agreement, with an Effective Date of May 20, 2015. Plaintiff, among other things, agreed to provide Preserve exclusivity to sell MaxKlor products in certain market segments and, in exchange, Preserve agreed to make minimum purchase requirements of MaxKlor each year. ECF No. [80-2]. The Agreement's initial term was through December 31, 2019. *Id.* § 10.

On May 1, 2016, Defendant acquired all of Preserve's stock. ECF No. [78-4]. Jason Lilly ("Lilly"), Defendant's Vice President of Corporate Development at the time, had reached out to Steve Perry ("Perry"), Plaintiff's President, prior to the acquisition in April 2016 to discuss the License Agreement and MaxKlor. *See* ECF No. [78-1]; ECF No. [78-5] at 2.

Immediately after the acquisition, on May 2, 2016, Lilly sent an e-mail to Plaintiff informing it of Defendant's acquisition of Preserve. ECF No. [78-5]. Lilly also indicated in his e-mail that "we do believe there is much we can do together, both with MaxKlor and future developments" and that he would be sending Plaintiff a consent letter "whereas you agree to continue to operate under the current agreement." *Id.* Shortly thereafter, Lilly sent the consent letter to Plaintiff as promised. ECF No. [78-4]. The consent form included the language "Consent for assignment of License Agreement" in the subject line, and in the body Defendant stated that, "As part of this transaction, it is our desire to transfer the Agreement between Conseal and Preserve to Neogen Corporation. It is our intent to continue to fulfill Preserve International's obligations in the agreement." *Id.*

As Plaintiff's COO Donna Gilmore ("Gilmore") explained in the e-mail, Plaintiff did not sign that particular consent form because it contained incorrect information, but the parties continued to discuss the possibility of consenting to the assignment in the same e-mail thread. ECF No. [78-9]; ECF No. [78-7]. Plaintiff contends that it provided written permission for a transfer of the Agreement from Preserve to Defendant later in that same e-mail chain after a discussion between Gilmore and Lilly. Specifically, on May 10, 2016, Gilmore, in discussing why Plaintiff could not sign the consent form, stated that "now might be a good time to discuss a revised License Agreement directly between ConSeal and Neogen." ECF No. [78-7]. Lilly responded that "We can do this, however, as Preserve is a current entity and the license between Preserve and Conseal is still valid, we can maintain the current agreement, I was simply trying to clean things up. As stated, we have no issue with the requirements of Agreemen [sic]." *Id.* Gilmore responded, "Great, we can continue on under the current agreement." *Id.* By making that statement, Plaintiff understood that Lilly was referring to Defendant taking the place of Preserve under the current Agreement,

and that Gilmore was agreeing that the parties could operate pursuant to the current Agreement rather than entering into a revised Agreement. ECF No. [78-2] at 140:18-144:8, 147:13-20. Gilmore testified that she intended her response to Lilly as confirmation that it was acceptable for Defendant to continue on under the current Agreement in Preserve's place. *Id.* In that same email chain, on May 17, 2020, Lilly followed up with Gilmore about the confirmation, asking, "You are comfortable working under the current agreement – yes?" ECF No. [78-7]. Gilmore responded "yes." *Id.*; ECF No. [78-2] at 149:21-150:11. However, there is no formal executed license agreement between the parties. ECF No. [80-3] at 148: 22–25.

Plaintiff explains that Defendant then began taking certain actions pursuant to the Agreement, such as sending Plaintiff its purchase orders for MaxKlor and listing itself in the contact information, ECF No. [78-16]; making payments to Plaintiff for MaxKlor orders from Defendant's bank account, ECF No. [78-17]; preparing "MaxKlor Receiving Reports" to reflect its receipt of orders of MaxKlor products, ECF No. [78-12]; depositing all revenue from MaxKlor sales into Defendant's bank accounts, ECF No. [78-13]; listing MaxKlor for sale on its website and in its product catalogs, ECF Nos. [78-14] & [78-15]; and sending all e-mails to Plaintiff from Defendat's email addresses with Defendant's signature blocks. Defendant also filed a U.S. Trademark Application for the MAXKLOR trademark on May 16, 2016, days after Plaintiff agreed to the transfer of the Agreement, which eventually registered as U.S. Trademark Registration No. 5,114,133 on January 3, 2017. ECF No. [78-16]. Defendant owns that Registration and it represented in its application that it was using the MAXKLOR trademark. ECF No. [78-17]. Meanwhile, Preserve ceased operating its website and its employees became Defendant's employees. ECF No. [78-6] at 20:16-21:24.

After the acquisition, Preserve continued to exist as a separately incorporated and operating entity under Nevada law. Before the consent form was sent to Plaintiff, it inquired whether "things will remain functioning as 'Preserve'? or change to Neogen?" ECF No. [80-4]. Lilly replied, "WE WILL REMAIN FUNCTIONING AS PRESERVE, BUT YOU WILL SEE NEOGEN AS THE ENTITY PAYING THE BILL." *Id.* Plaintiff acknowledged that arrangement in an email from Gilmore indicating that she "understood that it would continue as Preserve but the PO's and the payments are coming from Neogen. We are good with this as long as we have the proper paperwork in place." ECF No. [80-7]. Defendant indicates that its involvement in Preserve's operations was limited to assisting with certain back office functions like invoicing, billing and accounting, but Preserve remained separately functioning and maintains its separate facilities. At all times, both before and after Defendant's stock acquisition, Plaintiff shipped MaxKlor to the same location that it had previously shipped to when working with Preserve at its facility in Memphis, Tennessee. ECF No. [80-3] at 131:5-8.

The License Agreement does not set any price for MaxKlor. Instead, it provides that MaxKlor "[p]rices shall be determined by ConSeal in its sole discretion and shall be subject to change by ConSeal with notice to Licensee provided thirty (30) days in advance of any such price change." ECF No. [80-2] § 9. The initial price Plaintiff charged Preserve for MaxKlor in 2009 was approximately $90-$95 per five-gallon pail. ECF No. [78-2] at 38:8-13. However, after initial sales of MaxKlor, Preserve stated that it needed a lower price and Plaintiff agreed to a price of under $60 per five-gallon pail. *Id.* at 43:22-44:7, 45:19-23. Plaintiff's price to Preserve, and later to Defendant, remained constant between $50.20 and $55.50 from 2013 through the time that Defendant ceased purchasing MaxKlor in 2018. *Id.* When Preserve executed the Agreement on October 12, 2015, it had been purchasing MaxKlor for approximately six years since 2009, *id.* at

36:8-9, and in the Agreement, Preserve provided a representation and warranty that "Licensee has thoroughly investigated the Licensed Products [MaxKlor] and is convinced of their functional value and the economic and marketing possibilities." ECF No. [80-2] § 4(d).

In 2017, Defendant noted that the market conditions began to change and new competitors for MaxKlor began to enter the market and charge a substantially lower price for like products. ECF No. [80-9] at 99:7-101:19; ECF No. [80-11] at 9:23-10:17. Defendant maintains that, during the relevant times, the price Plaintiff charged for MaxKlor was approximately three times greater than the price other manufacturers charged for competing products by 2018. ECF No. [80-9] at 99:7-101:19. To allow Defendant to compete in the distribution market for MaxKlor, Defendant requested that Plaintiff reduce its price for a five-gallon pail of MaxKlor from $55.50 to approximately $23.00. ECF No. [80-10] at 3; ECF No. [80-9] at 107:5-109:3. Plaintiff suggested cetain modifications to the distribution and packing of MaxKlor products in order to lower the price, and requested information on the competing products in order to work toward a mutually agreeable reduction. *Id.* at 2-3. Despite later testifying that it does not regularly track its costs and profit margins, ECF No. [80-3] at 159:10-172:23, Plaintiff represented that its margins were very tight and that it lacked the flexibility to offer the requested reductions, ECF No. [80-10] at 2-3. The parties were unable to agree on any price reduction.

The Agreement required the purchase of annual minimum purchases of MaxKlor from Plaintiff, stating that the requirements were "monetary obligations" and that "[t]he minimum purchases made hereunder shall constitute the consideration received by ConSeal from Licensee in exchange for the license granted hereunder." ECF No. [80-2] § 9. Moreover, the Agreement provides that a failure to meet the minimum purchase requirements constitutes "performance defaults" and that "[i]n the event of any performance default by Licensee, ConSeal, in its sole

discretion, shall have the right to file an action seeking damages in the full amount of Licensee's monetary obligations under this Agreement." *Id.* § 11(a).

Defendant made its last purchase of MaxKlor in July 2018. On November 8, 2018, Defendant sent termination letter to Plaintiff to terminate the Agreement on December 31, 2018, but indicated that it would guarantee payment on existing purchase orders of MaxKlor. ECF No. [78-30]. The termination letter sought to terminate "the License Agreement between Preserve International, Inc. and Conseal International, Inc. surrounding the Licensed Products, specifically the MAXKLOR chlorine dioxide solution." *Id.* This letter referred to "Conseal's resistance to work with Preserve in adapting to market pricing of the product." *Id.* The termination letter also states that "Preserve shall cease and terminate all use of the Trademarks and Trade Names upon Termination of the Agreement. Preserve will release all its rights and will not make any claims on Conseal. This will allow Conseal to immediately seek new Licensees in the Territory." *Id.* Ultimately, Defendant did not meet the minimum purchase requirements set forth in the Agreement in 2018 and 2019.

## III. LEGAL STANDARD

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one party files such a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including, among other things, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of*

*Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which 'are jury functions, not those of a judge.'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *see also Crocker v. Beatty,* 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-movant's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant."). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

Initially, the moving party bears the "responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant

satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 322). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Yet, even where a non-movant neglects to submit any alleged material facts in dispute, a court must still be satisfied that the evidence in the record supports the uncontroverted material facts proposed by the movant before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004) ("*One Piece of Real Prop.*"). Indeed, even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Additionally, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345-46 (11th Cir. 2015). Indeed, even where the issues presented on motions for summary judgment overlap, a court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is under consideration." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014)

(citing *Am. Bankers Ins. Grp.*, 408 F.3d at 1331).[2] In particular, where "the parties respond[] to

each respective summary judgment motion with disputes as to the 'undisputed' facts, add[]

'material facts' of their own, and then repl[y] with subsequent objections to the other party's

additional facts," the mere filing of cross motions for summary judgment is not conclusive. *Id.*

Thus, where the parties disagree as to the facts, summary judgment cannot be entered unless one

of the parties meets its burden of demonstrating that "there is no dispute as to any material facts

with the evidence and all inferences drawn therefrom viewed in the light most favorable" to the

non-moving party. *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (citing *M/V Nan

Fung*, 695 F.2d at 1296-97).

---

[2] Indeed, the Court of Appeals for the Eleventh Circuit has explained each party's respective burden at the
summary judgment stage:

> When the *nonmoving* party has the burden of proof at trial, the moving party is not required
> to "support its motion with affidavits or other similar material *negating* the opponent's
> claim," *Celotex*, 477 U.S. at 323, in order to discharge this "initial responsibility." Instead,
> the moving party simply may "'show[]'—that is, point[] out to the district court—that there
> is an absence of evidence to support the nonmoving party's case." *Id.* at 324. Alternatively,
> the moving party may support its motion for summary judgment with affirmative evidence
> demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 331
> (Brennan, J., dissenting). If the moving party shows the absence of a triable issue of fact
> by either method, the burden on summary judgment shifts to the nonmoving party, who
> must show that a genuine issue remains for trial. Fed. R. Civ. P. 56(e); *Chanel, Inc. v.
> Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). If the nonmoving party fails
> to "make a sufficient showing on an essential element of her case with respect to which she
> has the burden of proof," *Celotex*, 477 U.S. at 323, the moving party is entitled to summary
> judgment.
>     When the *moving* party has the burden of proof at trial, that party must show
> *affirmatively* the absence of a genuine issue of material fact: it "must support its motion
> with credible evidence . . . that would entitle it to a directed verdict if not controverted at
> trial." *Id.* at 331 (Brennan, J., dissenting); *see also Chanel, Inc.*, 931 F.2d at 1477. In other
> words, the moving party must show that, on all the essential elements of its case on which
> it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party.
> *See id.* at 1477. If the moving party makes such an affirmative showing, it is entitled to
> summary judgment unless the nonmoving party, in response, "come[s] forward with
> significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.*;
> *see also* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).

*United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428,
1437-38 (11th Cir. 1991) (footnotes omitted) ("*Four Parcels*").

## IV.  DISCUSSION

### A.  Plaintiff's Motion for Summary Judgment on its Breach of Contract Claim

Plaintiff's Motion seeks partial summary judgment on its breach of contract claim, arguing that a valid agreement between the parties exists, which Defendant assumed after its acquisition of Preserve, Defendant breached the Agreement by failing to meet the minimum purchase requirements, and Plaintiff suffered damages in the amount of the monetary obligations set forth in the License Agreement. Moreover, Plaintiff contends that Defendant is the proper Licensee under the Agreement because it expressly or impliedly assumed the Agreement through its post-acquisition conduct or, alternatively, because it accepted the terms of the Agreement through assent by performance and/or estoppel. Finally, Plaintiff argues that none of Defendant's affirmative defenses preclude summary judgment on the breach of contract claim, and that it acted in good faith in setting commercially reasonable prices for MaxKlor with the input of Preserve.

Defendant responds that the record evidence conclusively shows that Preserve, not Defendant, is the Licensee under the Agreement, and Plaintiff has failed to bring forth any evidence to show that Defendant assumed the Agreement, agreed to make minimum purchases of MaxKlor, or suffered any economic damages from the alleged breach. Moreover, Defendant contends that Plaintiff breached the License Agreement by dealing in bad faith and failing to charge commercially reasonable prices for its products, and that Plaintiff assented to the termination of the Agreement in 2018, thus precluding any recovery of damages for the minimum purchase requirements in 2019. In addition, Defendant notes that the breach of contract claim cannot succeed on summary judgment because a number of provisions in the License Agreement are illusory, ambiguous, and unenforceable.

### 1.  Liability for Breach of Contract

Plaintiff's Motion requests summary judgment on the issue of liability for its breach of contract claim because, Plaintiff contends, it has demonstrated the absence of any genuine issues of material fact on each required element of its claim. Specifically, Plaintiff argues that, in light of the parties' written communications and Defendant's post-acquisition conduct, Defendant has assumed the rights and obligations under the License Agreement, breached the Agreement by failing to meet the minimum purchase requirements, and this breach was the proximate cause of Plaintiff's damages, which amount to the monetary obligations specified in the Agreement.

Defendant argues that there is no enforceable contract between the parties, and that Plaintiff has failed to submit any evidence to support its claim that Defendant assumed the rights and obligations under the License Agreement or that Plaintiff suffered damages from any alleged breach. Further, Defendant contends that Plaintiff's breach of contract claim is barred because the License Agreement's open-price term, ECF No. [80-2] at 4-5, § 9, modification clause, *id.* at 6-7, § 13(g), and minimum purchase requirement, *id.* at 4-5, § 9, must fail as a matter of law because they are illusory and unenforceable. Lastly, Defendant alleges that its affirmative defenses are clearly supported by evidence in the record and, at a minimum, these defenses present genuine disputes of fact on Plaintiff's breach of contract claim that preclude summary judgment.

"In order to establish a breach of contract claim under Florida law,[3 a plaintiff] must show the existence of an agreement between the parties, a material breach of that agreement by [the defendant], and damages resulting therefrom." *Liebherr-Mining Equip. Colmar SAS v. Castec, Inc.*, No. 11-cv-22887, 2013 WL 85179, at *3 (S.D. Fla. Jan. 7, 2013) (citing *Osorio v. State Farm Bank, F.S.B.*, 862 F. Supp. 2d 1336, 1340 (S.D. Fla. 2012)). "Issues of contract interpretation are

---

[3] The License Agreement in this case is governed by Florida law. *See* ECF No. [78-3] at 7, § 13(h).

generally questions of law and, thus, properly resolved on summary judgment," although "the existence of a contract is a question of fact to be determined by consideration of all the facts and circumstances." *Lockheed Martin Corp. v. Galaxis USA, Ltd.*, 222 F. Supp. 2d 1315, 1323 (M.D. Fla. 2002).[4] Moreover, it is "well established that a written contract may be modified by a subsequent oral agreement or subsequent conduct of the parties, even though the written contract purports to prohibit such modification." *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1298 (M.D. Fla. 2009) (quoting *Beach Higher Power Corp. v. Granados*, 717 So. 2d 563, 565 (Fla. 3d DCA 1998)).

In Florida, courts use "an objective test . . . to determine whether a contract is enforceable." *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985). "To determine the creation and scope of a contract, courts must not 'depend on the agreement of two minds in one intention, but on the agreement of two sets of external signs.'" *Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1207 (M.D. Fla. 2002) (quoting *Cheverie v. Geisser*, 783 So.2d 1115, 1119 (Fla. 4th DCA 2001)).

While it is undisputed that a valid agreement existed between Plaintiff and *Preserve*, the central question before the Court is whether Defendant, upon acquiring Preserve, expressly or impliedly assumed Preserve's rights and obligations under the License Agreement. The parties present markedly different interpretations of their post-acquisition communications and conduct.

---

[4] "A valid, binding contract requires offer, acceptance, consideration and sufficient specification of the essential terms." *Phillips v. Hobby Lobby Stores, Inc.*, No. 2:16-cv-00837-JEO, 2019 WL 8348613, at *3 (N.D. Ala. Dec. 16, 2019) (citing *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)). "A valid contract – premised on the parties' requisite willingness to contract – may be 'manifested through written or spoken words or inferred in whole or in part from the parties' conduct.'" *Id.* (quoting *L&H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. 5th DCA 2011)). "A 'material breach' of a contract is a failure, without legal excuse, to perform any promise or obligation or that goes 'to the essence of the contract.'" *Oriole Gardens Condos., III v. Indep. Cas. & Sur. Co.*, No. 11-60294-CIV, 2012 WL 718803, at *11 (S.D. Fla. Mar. 6, 2012) (quoting *Covelli Family, LP v. ABG5, LLC*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008); *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So. 2d 853, 857 (Fla. 4th DCA 1972)). Additionally, the party injured by the breach is entitled to recover those damages that "naturally flow from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was entered." *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1280 (Fla. 5th DCA 2002).

These contrasting views, in essence, amount to disagreements about the parties' intent and mutual understanding about Defendant's potential assumption of the Agreement. "Where the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment." *Tingley Sys., Inc. v. HealthLink, Inc.*, 509 F. Supp. 2d 1209, 1214-15 (M.D. Fla. 2007) (quoting *Strama v. Union Fidelity Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001)); *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991) (intent is question of fact for the factfinder).

Plaintiff argues that, at Defendant's request and following a string of e-mail correspondence, it provided its written consent for Defendant to assume Preserve's rights and obligations under the Agreement. Plaintiff then cites to significant post-termination conduct demonstrating that Defendant had assumed the Agreement and was operating under and benefitting from the rights granted pursuant to the Agreement—e.g., ordering, listing, marketing, and selling MaxKlor products on Defendant's website, sending all communications between the parties from Defendant's employees on Defendant's letterhead, Defendant's successful trademark application for MaxKlor indicating that it was using the tradename, making payments from Defendant's bank accounts and depositing payments into the same, transitioning all former Preserve employees into Defendant's employees, and discontinuing Preserve's website and all Preserve e-mail accounts. Plaintiff argues that this evidence conclusively establishes that Defendant assumed the License Agreement—both expressly, through its written communications requesting Plaintiff's consent to transfer the Agreement, and impliedly, through its subsequent conduct indicating that it displaced Preserve under the Agreement. As such, Plaintiff maintains that no genuine issue of material fact exists regarding Defendant's liability under the Agreement.

Conversely, Defendant presents a reading of its correspondence with Plaintiff indicating the parties' assent to continue operating under the License Agreement as it existed between Preserve and Plaintiff, and it reemphasizes that Preserve remained an independent corporate entity from Defendant after the acquisition. Defendant explains that it assisted Preserve with "back-office functions like invoicing, billing and accounting," but that Preserve maintained its own independent facility in Memphis, Tennessee, generated its own costs and revenues, and operated under its own contractual rights and obligations. ECF No. [97] at 14-15. Defendant also notes that, both before and after its stock acquisition of Preserve, all of the orders Plaintiff received for shipments of MaxKlor were shipped to the same Memphis facility. As such, Defendant contends that there are genuine issues of fact as to the validity and meaning of the Agreement that preclude granting summary judgment on Plaintiff's breach of contract claim.

"The cornerstone of a breach of contract action is the existence of a contract." *Mana Internet Sols., Inc. v. Internet Billing Co.*, No. 06-cv-61515, 2007 WL 1455973, at *2 (S.D. Fla. May 16, 2007) (citing *Beck v. Lazard Freres & Co.*, 175 F.3d 913, 914 (11th Cir. 1999)). Yet, "[i]t is axiomatic that a party may not be held liable for a breach of contract if they were not a party to the contract or otherwise agreed to accept its terms." *Id.*; *see also Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1073 (11th Cir. 2003) ("[g]enerally, a contract does not bind one who is not a party to the contract, or who has not in some manner agreed to accept its terms"). Nevertheless, "[a] contract is binding, despite the fact that one party did not sign the contract, where both parties have performed under the contract." *Consol. Res. Healthcare Fund I, Ltd. v. Fenelus*, 853 So. 2d 500, 503 (Fla. 4th DCA 2003) (quoting *Integrated Health Servs. of Green Briar, Inc. v. Lopez-Silvero*, 827 So. 2d 338, 339 (Fla. 3d DCA 2002)). "A contract may be binding on a party despite the absence of a party's signature. The object of a signature is to show mutuality

or assent, but these facts may be shown in other ways, for example, by the acts or conduct of the parties." *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1228 (S.D. Fla. 2009) (quoting *Gateway Cable T.V., Inc. v. Vikoa Constr. Corp.*, 253 So. 2d 461, 463 (Fla. 1st DCA 1971)); *see also Fenelus*, 853 So. 2d at 503 (party assented to the contract by performing under the contract).

Thus, "while it is true that non-signatories are generally not bound by contracts, 'traditional principles of state law' may allow 'a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third party beneficiary theories, waiver and estoppel.'" *Cajun Glob. LLC v. Swati Enters., Inc.*, 283 F. Supp. 3d 1325, 1330 (N.D. Ga. 2017) (internal quotation marks omitted) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)) (citing *Emps. Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316 (11th Cir. 2001) (holding that a non-signatory was bound by a contractual arbitration clause because even though he did not sign the contract with the arbitration provision, the non-signatory did sign a "Takeover Agreement" which "clearly reveals [his] intent to 'step in the shoes' of [the predecessor]"); *A.L. Williams & Assoc., Inc. v. McMahon*, 697 F. Supp. 488, 494 (N.D. Ga. 1988) (finding that "a party cannot have it both ways; it cannot rely on the contract when it works to its advantage and then repute it when it works to its disadvantage."); *Quail Cruises Ship Mgmt. Ltd. v. Agencia De Viagens Cvc Tur Limitada*, No. 09-23248-CIV, 2010 WL 1524313, at *4 (S.D. Fla. Apr. 14, 2010) (noting that equitable estoppel prevents a party from benefiting "from the terms of a contract while simultaneously avoiding its burdens.")); *see also Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166 (11th Cir. 2011); *Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc.*, No. 19-cv-62412, 2020 WL 3078531, at *12 (S.D. Fla. June 10, 2020).

The parties do not dispute, and the Court agrees, the existence of an agreement between Plaintiff and Preserve. Rather, their disagreement stems from their differing inferences about their subsequent oral and written conversations discussing the possible transfer of the License Agreement from Preserve to Defendant.

After calling Perry in April 2016 to discuss the License Agreement and MaxKlor, Lilly sent an e-mail to Plaintiff regarding the acquisition of Preserve and indicating that he would be sending Plaintiff a consent letter to sign to agree to continue to operate under the Agreement and accept that Defendant was the parent company of Preserve. ECF No. [78-5] at 2. On May 1, 2016, Defendant sent Plaintiff the consent form, explaining that, "[a]s part of this transaction, it is our desire to transfer the Agreement between Conseal and Preserve to Negen Corporation. It is our intent to continue to fulfill Preserve International's obligations in the agreement, however, in order to do so, your express written consent is required." ECF No. [78-4] at 2. In the same e-mail thread, upon noting that Plaintiff could not sign the consent form because it contained incorrect information, Gilmore responded to Lilly suggesting a revised license between Plaintiff and Defendant. ECF No. [78-7] at 3. On May 11, 2016, Lilly replied to the e-mail stating, "We can do this, however, as Preserve is a current entity and the license between Preserve and Conseal is still valid, we can maintain the current agreement. I was simply trying to clean things up. *As stated, we have no issue with the requirements of Agreemen* [sic]." *Id.* (emphasis added). Then, on May 17, 2020, Lilly responded to Gilmore to confirm, "You are comfortable working under the current agreement – yes?" *Id.* at 2. Gilmore once again confirmed, "yes," in reply. *Id.*

After this e-mail exchange, Plaintiff began dealing with Defendant directly on MaxKlor orders, and Defendant likewise began sending purchase orders for MaxKlor on its order forms, making payments for MaxKlor with funds from Defendant's bank account, listing MaxKlor for

sale on Defendant's website and in its product catalogs, and preparing Defendant's Material Receiving Reports for its receipt of MaxKlor. *See* ECF Nos. [78-8] – [78-15]. Likewise, soon after receiving permission from Plaintiff to transfer the Agreement to Defendant, it filed a U.S. Trademark Application for MAXKLOR, which indicated that Defendant was using the trademark, and Defendant remained the sole owner of the Registration. ECF Nos. [78-16] & [78-17].

Plaintiff argues that all parties to this correspondence understood that the intent was to have Defendant replace Preserve, while continuing to operate under the Agreement that was already in place. While this evidence strongly suggests that the parties exchanged written notice and consent to the assignment of the License Agreement from Preserve to Defendant, at summary judgment, the Court must take Defendant's starkly different interpretation of this email exchange as true. Defendant contends that the relevant e-mail from Lilly—"We can do this, however, *as Preserve is a current entity and the license between Preserve and Conseal is still valid, we can maintain the current agreement*. I was simply trying to clean things up. As stated, we have no issue with the requirements of Agreemen [sic]."—clearly indicates that the parties agreed to continue operating under the existing Agreement and license between Preserve and Plaintiff. ECF No. [78-7] at 3 (emphasis added). Defendant submits further support for this interpretation in the form of evidence showing that Preserve was an ongoing, separate entity from Defendant, it operated out of the same facility that Plaintiff had always shipped MaxKlor orders to, and that it maintained its own financial statements. ECF No. [96-2] at 16:15-17:15, 136:3-22. Defendant's involvement in Preserve's operations was limited to providing administrative, back-office functions. ECF No. [96-4] at 23:1-9.

The parties' contrasting perspectives establish the existence of disputes of material fact on the issue of whether Defendant assumed the License Agreement on Preserve's behalf and can thus

be held liable for the contractual obligations under that Agreement. "To construe the disputed provisions in light of the parties' differing constructions, 'the Court will have to delve into questions of intent and credibility, which are improper inquiries at the summary judgment stage.'" *Assa Compania De Seguros, S.A. v. Codotrans, Inc.*, No. 13-23563-CIV, 2014 WL 11906600, at *3 (S.D. Fla. Sept. 12, 2014) (quoting *Onuss Ortak Nokta Uluslararasi Haberlesme Sistem Servis Bilgisayar Yazilim Danismanlik Ve Dis Ticaret Limited Sirketi v. Terminal Exch., LLC*, No. 09-80720-CIV, 2010 WL 5393488, at *7 (S.D. Fla. Dec. 21, 2010)); *see also Chanel, Inc.*, 931 F.2d at 1476 (noting intent is a question of fact for the factfinder).[5] As the movant, Plaintiff must show the absence of any genuine issues of material fact on each essential element of its breach of contract claim. *Four Parcels*, 941 F.2d at 1437-38. The material factual disputes regarding whether a valid agreement exists between Plaintiff and Defendant foreclose Plaintiff's requested relief.[6] Because the Court must take the non-movant's rendition of the facts as true and draw all reasonable inferences in its favor, and because Defendant presents evidentiary support for the material

---

[5] When considering a motion for summary judgment,

> If the record presents factual issues, the Court must not decide them; it must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment. *Impossible Elec. Techs., Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982)[.]

*Wilmington Tr., N.A. v. Estate of Gonzalez*, No. 15-cv-23370, 2016 WL 11656681, at *5 (S.D. Fla. Nov. 1, 2016).

[6] Because Plaintiff's breach of contract claim fails on the first required element, the Court need not address the remaining two elements. Additionally, Plaintiff's Motion briefly addresses Defendant's liability-based affirmative defenses in arguing that none of the defenses preclude summary judgment in its favor. Below, the Court will address in detail any such defense that is raised in Defendant's Motion.

disputes of fact regarding Defendant's alleged liability under the License Agreement, Plaintiff's Motion must be denied.

### B.  Defendant's Motion for Summary Judgment on all of Plaintiff's Claims

Defendant argues that it is entitled to either partial or full summary judgment on Plaintiff's claims for three reasons: (1) Plaintiff lacks any evidence to establish that an enforceable agreement exists between itself and Defendant, and it similarly cannot demonstrate that Defendant ever agreed to adhere to any minimum purchase requirements of MaxKlor; (2) Plaintiff, on two separate occasions, agreed that the License Agreement terminated at the end of 2018, which precludes any recovery for damages allegedly incurred in 2019; and (3) Plaintiff materially breached the License Agreement's open price term by dealing in bad faith and by failing to set commercially reasonable prices for MaxKlor.

Plaintiff responds that Defendant's Motion must be denied because it cannot conclusively demonstrate that Plaintiff will be unable to prove any of its claims at trial. At a minimum, Plaintiff contends, there are genuine issues of fact on the issue of Defendant's assumption of the Agreement. Likewise, it argues that the MaxKlor prices were set in good faith, with the input and feedback from Preserve, and they have remained the same since Plaintiff entered into the License Agreement with Preserve in 2016. In any event, Plaintiff notes that Defendant has failed to provide information or evidence on the allegedly competitive cheaper products, despite Plaintiff's repeated requests for this information. Regarding Defendant's position that any damages are limited to the failed minimum purchase requirements in 2018 because of Plaintiff's alleged agreement to early termination, Plaintiff explains that Defendant had no right to terminate under the Agreement, and notes that, although the letters from its former counsel are inadmissible settlement communications, they nonetheless had no effect on the ongoing existence of the Agreement in

2019. Finally, Plaintiff briefly notes that Defendant seeks summary judgment on all of Plaintiff's claims, but fails to even mention the other four claims for relief asserted in the Complaint. Nonetheless, it contends that its alternative claims present genuine issues of material fact that preclude summary judgment.

### 1. Defendant's Assumption of the License Agreement

Defendant first argues that it is not liable for any alleged breach of the License Agreement because it is not a party to the Agreement, and thus cannot be bound by it. Moreover, Defendant states that it has never assumed any of Preserve's contractual obligations and Plaintiff cannot point to any evidence to establish that it agreed to take on the minimum purchase requirements. Instead, Defendant notes that the correspondence between Lilly and Gilmore stating that they could maintain the current agreement conclusively demonstrated the parties' intent for Plaintiff and Preserve to continue operating under the License Agreement. Preserve and Plaintiff's subsequent conduct, according to Defendant, also reenforces its understanding of the parties' intent because Plaintiff continued to ship orders of MaxKlor to Preserve's facility and Preserve continued to maintain its own financial and legal obligations. Thus, Defendant argues that no material issues of fact exist as to its liability under the Agreement.

Similar to the Court's discussion above, Plaintiff contends that the record evidence, at the very least, shows significant issues of material fact regarding whether the Agreement is enforceable against Defendant. First, Plaintiff explains that the parties' e-mail communication regarding whether to transfer the Agreement to Defendant is the exact type of written consent that Defendant claims does not exist. *See* ECF No. [78-7] at 3 ("Preserve is a current entity and the license between Preserve and Conseal is still valid, we can maintain the current agreement. . . . we

have no issue with *the requirements* of Agreemen [sic]." (emphasis added)).[7] Additionally, even

if this communication does not establish Defendant's written consent to be bound by the

Agreement, the parties' relationship since the 2016 acquisition and Defendant's subsequent

conduct pursuant to the Agreement clearly present factual disputes regarding Defendant's

assumption. *See Sierra Equity Grp., Inc.*, 650 F. Supp. 2d at 1228 ("A contract may be binding on

a party despite the absence of a party's signature. The object of a signature is to show mutuality or

assent, but these facts may be shown in other ways, for example, by the acts or conduct of the

parties." (quoting *Gateway Cable T.V., Inc.*, 253 So. 2d at 463)); *see also Fenelus*, 853 So. 2d at

503 (party assented to the contract by performing under the contract).[8]

Notably, shortly after Plaintiff e-mailed its written consent to transfer the agreement,

Defendant began engaging in a consistent course of conduct as if it was the Licensee. In particular,

Plaintiff began dealing solely with Defendant and its employees on sales, payment, questions,

advertisement, etc. on MaxKlor orders, and never communicated with any Preserve employee after

that point. Moreover, Defendant's trademark application and registration for MAXKLOR stated

that it is the sole owner of the mark and the current user of the mark. Upon examining these facts

---

[7] To the extent that Defendant attempts to argue that it cannot be liable for the specific minimum purchase requirements, even if it is somehow bound by the Agreement, the Court finds that this position is unsupported in the record. *See A.L. Williams & Assoc., Inc.*, 697 F. Supp. at 494 (finding that "a party cannot have it both ways; it cannot rely on the contract when it works to its advantage and then repute it when it works to its disadvantage.").

[8] Courts may consider "evidence of a subsequent, post-contract oral agreement that alters, modifies or changes the former existing agreement between the parties." *Regions Bank v. Old Jupiter, LLC*, No. 10-80188-CIV, 2010 WL 5148467, at *3 (S.D. Fla. Dec. 13, 2010), *aff'd*, 449 F. App'x 818 (11th Cir. 2011); *see also J. Lynn Constr. Inc. v. The Fairways at Boca Golf & Tennis Condo. Assoc., Inc.*, 962 So. 2d 928 (Fla. 4th DCA 2007) (trial court required to consider whether written contract was orally modified, where oral change to contract allegedly occurred over one month after contract's execution); *Schroeder v. Manceri*, 893 So. 2d 603 (Fla. 4th DCA 2005) (requiring trial court to consider evidence that maker of promissory note agreed to oral extension of written note). "Thus, evidence relating to a subsequent oral modification or course of dealing may be admissible, even where the written contract contains a merger clause." *Regions Bank*, 2010 WL 5148467, at *3 (citing *Linear Corp. v. Standard Hardware Co.*, 423 So. 2d 966 (Fla. 1st DCA 1982)).

in the light most favorable to Plaintiff and drawing all reasonable inferences in its favor on Defendant's Motion, the Court concludes, as it did with Plaintiff's Motion, that genuine issues of fact exist regarding whether Defendant assumed Preserve's obligations under the Agreement. These factual disputes establish the existence of triable issues of fact, which preclude granting Defendant's request for summary judgment.

## 2. Termination of the License Agreement

Defendant also requests that this Court grant summary judgment, limiting Plaintiff's recovery of any damages to the 2018 minimum purchase requirements, because Defendant properly terminated the License Agreement on December 31, 2018. ECF No. [78-30]. Defendant states that Plaintiff, through two separate communications sent by its pre-suit counsel, expressly agreed in writing to the Agreement's termination, which forecloses recovery for 2019 minimum purchase amounts. ECF Nos. [80-16] & [80-18]. Defendant contends that these letters represent Plaintiff's agreement to the termination through an election of remedies, and that this termination eliminated any possible recovery for 2019 minimum purchase requirements.

Plaintiff responds that neither letter was a termination or acceptance of Plaintiff's termination, but rather were taken out of context to weaponize its pre-suit settlement negotiations and limit any potential recovery. Defendant relies on the following language in the first letter as an indication of Plaintiff's agreement: "We are in receipt of your letter, dated November 8, 2018, exercising Neogen's right pursuant to the Agreement to terminate the same upon thirty (30) days written notice and acknowledge that the Agreement will terminate on December 31, 2018." ECF No. [80-16] at 2. Yet, he also proceeds to state, "However, just for the record, I feel that I must correct the allegations in your letter that you were somehow compelled to terminate the Agreement as a result of any '. . . failure on the part of ConSeal to fulfill the commercial intent of the

Agreement' . . . ." *Id.* Instead, he explains that, upon Defendant's termination, Plaintiff continued to maintain the MaxKlor pricing pursuant to the Agreement, despite Defendant's breach, and made a formal demand for payment of the minimum purchase requirements owed. *Id.* at 3. Similarly, the second letter states, in relevant part, that "Pursuant to a letter dated November 8, 2018, you exercised Neogen's right pursuant to the Agreement to terminate the same upon thirty (30) days written notice, and as a result thereof the Agreement terminated on December 31, 2018." ECF No. [80-18] at 2. Plaintiff's counsel proceeds to warn Defendant of the outstanding debt it owed Plaintiff, and outlines the various other monetary provisions it will owe under the Agreement (including the minimum purchase requirements) upon Defendant's performance default. *Id.* at 2-3.

Plaintiff argues that nothing in these letters demonstrates its intention to agree to the termination of the Agreement. It maintains that these letters were sent as good faith efforts to resolve the parties' disputes before resorting to litigation, and that they should not be weaponized against Plaintiff to limit its possible recovery. The Court reviews the content of these communications, and Plaintiff's intent, in the light most favorable to Plaintiff, as the non-movant. In doing so, the Court notes the obvious factual disputes that these letters present for each party, which preclude relief on a motion for summary judgment. These factual disputes must be resolved at trial. Thus, Defendant's Motion is denied as to the requested damages limitation.

### 3. Good Faith Conduct and Commercially Reasonable Pricing

Defendant also argues that summary judgment is warranted because Plaintiff's claims are barred due to its bad faith conduct in charging commercially unreasonable prices for MaxKlor. Specifically, the License Agreement does not have a fixed price, but rather has an open price term that Plaintiff can determine and change in its sole discretion. Defendant acknowledges that open

price terms are not automatically invalid, but notes that they require that prices be determined in good faith and in consideration of commercial reasonableness. Defendant alleges that Plaintiff's MaxKlor prices were three times higher than the prices of commercially reasonable competitiors, and, despite being aware of this price difference, Plaintiff failed to take any steps to offer meaningful price reductions. This inflexible pricing structure eventually caused Defendant to terminate the Agreement and seek out cheaper alternatives to MaxKlor. Defendant asserts that Gilmore, during her deposition, could not offer any reasonable explanations for the price discrepancy between MaxKlor and other competitors, and she testified that Plaintiff does not monitor any economic indicators or conduct any market analysis to ensure competitive pricing. In addition, Defendant claims that Gilmore admitted in her deposition that she misrepresented her costs and pricing scheme in discussing any potential price reductions with Defendant, which indicates its bad faith conduct.

Plaintiff responds that Defendant has not, either during their price negotiations or during this litigation, provided Plaintiff with any information whatsoever on the allegedly competitive alternative product, including the name, market price, chemical makeup, etc. to properly allow Plaintiff to develop a more competitive product that is comparable. *See* ECF No. [80-3] at 158:2-165:4. Because Plaintiff's business structure does not actively seek out new clients, it relies heavily on the feedback of its clients in determining the performance of its products and the commercial reasonableness of its prices. Indeed, the current price of MaxKlor was set by Preserve in 2015, after it tested the product and pricing in the market, and Plaintiff did offer Preserve price concessions during their relationship based on this market performance. After Preserve sold MaxKlor in the market for almost six years, it formalized its License Agreement with Plaintiff, and represented in the Agreement that "Licensee has thoroughly investigated the Licensed

Products [MaxKlor] and is convinced of their functional value and the economic and marketing possibilities." ECF No. [80-2] at 3, § 4(d).

Although Plaintiff does not have a formal system for computing its economic and market variables, Gilmore testified that, in setting its pricing, she would assess Plaintiff's costs of raw materials, packaging, freight, and anticipated volume, ECF No. [80-3] at 46:2-19, and explained that Perry, had independent knowledge on what kinds of products were entering the market through his own research, *id.* at 53:4-9. Based upon Preserve's stated profit margin and pricing development, Plaintiff agreed to set the price of $55.50 per five-gallon pail, and MaxKlor has remained at that price since Plaintiff enterd into the License Agreement with Preserve. *Id.* at 39:11-45:25. Further, Plaintiff contends that Gilmore's statements regarding tight margins and her alleged misrepresentations during her price negotiations with Defendant were mere posturing during good faith discussions aimed at working with Defendant to reduce the price of MaxKlor and develop a more suitable product to compete with the new market entrants. Nonetheless, Plaintiff alleges, despite repeated requests to provide data on the competing products, Defendant never complied with these requests, and instead terminated the Agreement to find cheaper products and maximize their profit margins. In sum, Plaintiff contends that summary judgment is not warranted because it has historically acted in good faith, seeking to accommodate Defendant and adapt to the market.

The Uniform Commercial Code ("UCC") requires that a contract with an open price term be fixed in "good faith," Fla. Stat. § 672.305(2), which includes the subjective and objective components of "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade," Fla. Stat. § 672.103(1)(b). Further, the Official Comments to the UCC discuss the good faith requirement for an open price term and create a presumption that in a "normal case,"

a seller's posted price is also a good faith price. Specifically, the Comments explain that the good

faith requirement for an open price term:

> where the price is to be fixed by one party [§ 672.103(1)(b)] rejects the
> uncommercial idea that an agreement that the seller may fix the price means that
> he may fix any price he may wish by the express qualification that the price so fixed
> must be fixed in good faith. Good faith includes observance of reasonable
> commercial standards of fair dealing in the trade if the party is a merchant. (Section
> 2-103). But in the normal case a "posted price" or a future seller's or buyer's "given
> price," "price in effect," "market price," or the like satisfies the good faith
> requirement.

UCC § 2-305 cmt. 3.

Although the UCC does not define the "normal case," as contemplated by comment 3, the

Eleventh Circuit has recognized "that the draftsmen of the UCC intended that the safe harbor

created by the normal case good faith presumption apply broadly lest every price set pursuant to

an open-price term be vulnerable to attack and subject to litigation." *Autry Petroleum Co. v. BP

Prod. N. Am., Inc.*, 334 F. App'x 982, 985 (11th Cir. 2009) (citing Walter D. Malcolm, *The

Proposed Commercial Code: A Report on Developments from May 1950 through February 1951*,

6 Bus. Law. 113, 185-186 (1950-51)).[9] This safe harbor seeks "to avoid imposing on the open-

price-term setter the burden of establishing the reasonableness of the price set; the open-price term

provision was crafted to insulate posted prices and the like from reasonableness review provided

---

[9] The Eleventh Circuit has recognized that,

> under Florida law, the limit placed on a party's discretion in this respect "is not
> great." *See Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th
> Cir. 2001) (affirming entry of summary judgment where an automobile
> manufacturer's unilateral disapproval of a proposed transfer and relocation of an
> automobile dealership was neither capricious nor in contravention of the parties'
> reasonable expectations). As a result, a party's decision will not violate the implied
> covenant of good faith and fair dealing "unless no reasonable party . . . would have
> made the same discretionary decision." *Id.* (citing *Sepe v. City of Safety Harbor*,
> 761 So. 2d 1182, 1185 (Fla. 2d DCA 2000)).

*Barnes v. Diamond Aircraft Indus., Inc.*, 499 F. Supp. 2d 1311, 1320 (S.D. Fla. 2007).

the price imposed was not discriminatory." *Id.* (citing *Wayman v. Amoco Oil Co.*, 923 F. Supp.

1322, 1346-47 (D. Kan. 1996) ("It is abundantly clear . . . that the chief concern of the UCC

Drafting Committee in adopting § 2-305(2) was to prevent *discriminatory* pricing—i.e., to prevent

suppliers from charging two buyers with identical pricing provisions . . . different prices for

arbitrary or discriminatory reasons." (emphasis in original))).

> Moreover,
>
> Commercial reasonableness acts as a guide for courts to determine whether a party
> acted in good faith. Because there is no precise definition of the term "commercial
> reasonableness," the facts of the case will be determinative of whether conduct is
> commercially reasonable. *See Colorado Interstate Gas Co. v. Natural Gas Pipeline
> Co.*, 661 F. Supp. 1448, 1476 (D. Wyo. 1987). "All the factors are to be evaluated
> according to the standard of commercial reasonableness under the particular
> circumstances of the case." *S&S, Inc. v. Meyer*, 478 N.W.2d 857, 863 (Iowa App.
> 1991). Departures from customary usages and commercial practice, flushed out
> through expert testimony, strongly indicate that the merchant's conduct is
> unreasonable. *Mantese, The UCC and Keeping the (Good) Faith*, 70 Mich. Bar J.
> 270, 274 (March 1991) (a party is not required to prove the existence of a specific
> commercial standard or rule to prove a failure of reasonable commercial standards
> of fair dealing in the trade where the merchant's conduct is inconsistent with other
> related norms).

*Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1323 (S.D. Fla. 1999).

Upon a review of the evidence in the record, the Court is unpersuaded by Defendant's

contention that Plaintiff's alleged bad faith conduct is affirmatively proven and that no factual

disputes remain. Looking at the record in the light most favorable to Plaintiff reveals significant

disputes about the parties' intent during their price-reduction discussions and the reasonableness

of their respective conduct. If Plaintiff was offering a truly superior product, as it alleges it was

with MaxKlor products, then refusing to reduce the price that had been consistently maintained

for years could be viewed as a reasonable discretionary decision, especially after testing its

adequacy in the market and receiving approval from Preserve. Furthermore, the Court remains

unpersuaded that Plaintiff's actions and negotiations were conducted in bad faith, considering the

fact that Plaintiff made repeated unanswered requests for information regarding the competitive product and its pricing and distribution in order to work with Defendant in reaching a meaningful price. Defendant rests its allegation of bad faith in part upon its own representation that MaxKlor's price was three times higher than its competitor's prices, yet, when repeatedly asked for information on those competitors so that Plaintiff could address the discrepancy, Defendant failed to answer. That Plaintiff then refused to offer any reductions based on Defendant's unsubstantiated information does not, alone, render Plaintiff's price unreasonable.

In sum, "the parties' intentions in setting an open price term, as well as the reasonableness of an open price term are questions for the trier of fact. The question of price then—whether it was reasonable as calculated—is a question for the jury to resolve upon the evidence." *Allapattah Servs., Inc.*, 61 F. Supp. 2d at 1324 (citing *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 548 (6th Cir. 1981)). Defendant's allegations of bad faith and commercial unreasonableness present significant questions of fact and require credibility determinations that this Court is unable to make at summary judgment. Thus, Defendant's Motion is denied on this issue.

### 4. Defendant's Other Alternative Claims for Relief

Lastly, throughout Defendant's Motion, it argues that it is entitled to summary judgment on all five of Plaintiff's claims for relief, not just on the breach of contract claim. However, Defendant fails to present any argument or citation to legal authority in support of its alleged entitlement to summary judgment on Plaintiff's four remaining claims.[10] Each of Plaintiff's

---

[10] While Defendant correctly notes that Plaintiff bears the burden to demonstrate each element of each of its claims, Defendant, as the movant, initially bears the responsibility "of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. Neither the broad references to Plaintiff's "claims" in the Motion, *see, e.g.*, ECF No. [81] at 13, nor the passing footnote dismissing the alternative counts are sufficient for Defendant to meet its burden on a motion for summary judgment, *id.* at 12 n.2. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) ("If the party moving for summary

remaining four claims—namely, open account, account stated, promissory estoppel, and unjust enrichment—are pled in the alternative to the breach of contract claim." *GenTek, Inc. v. TDK-Lambda Americas, Inc.*, No. 8:08-cv-2315-T-26TGW, 2010 WL 668173, at *6 (M.D. Fla. Feb. 18, 2010). "Although these claims may be disposed of in summary judgment proceedings, the Court finds that [Plaintiff] should have the opportunity to prove its equitable claims should [Defendant] be successful on its claim that the [] agreement between the parties is unenforceable or in some other way invalid." *Id.* (citing *Amend v. 485 Props., LLC*, 401 F.3d 1255, 1260 (11th Cir. 2005); *Hurst v. Dezer/Reyes Corp.*, 82 F.3d 232, 235 (8th Cir. 1996)). "Accordingly, a determination regarding these alternative claims would be premature at this juncture." *Id.*; *see also Balthazar Mgmt. v. Beale St. Blues Co., Inc.*, No. 17-cv-81214, 2018 WL 8221675, at *6 (S.D. Fla. Oct. 17, 2018) ("There has been no determination in this case regarding Plaintiff's claims for breach of contract and unjust enrichment. Until an express breach of contract is or is not proven, the Court finds summary judgment on Defendants' second affirmative defense to be premature.").

## V. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion for Summary Judgment on Plaintiff's Breach of Contract Claim (Count I), **ECF Nos. [71] & [77]**, is **DENIED**.

2. Defendant's Motion for Summary Judgment, **ECF Nos. [69] & [81]**, is **DENIED**.

---

judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." (citing *Coats & Clark*, 929 F.2d at 608)). Nonetheless, resolution of these alternatively pled claims would be premature at this stage.

Case No. 19-cv-61242-BLOOM/Valle

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 21, 2020.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record